John A. INFANTOLINO

v.

STATE.

No. 79–437–C.A.

Supreme Court of Rhode Island.

May 12, 1980.

Joseph A. Bevilacqua, Jr., Providence, for petitioner.

Dennis J. Roberts, II, Atty. Gen., Maureen E. McKenna, Sp. Asst. Atty. Gen., for respondent.

OPINION

MURRAY, Justice.

The applicant John Infantolino appeals pursuant to G.L.1956 (1969 Reenactment) § 10–9.1–9, as enacted by P.L.1974, ch. 220, § 3, from a Superior Court justice's denial of his application for postconviction relief from his conviction in January 1975 of second-degree murder.[1] In light of our subsequent ruling in In re John Doe, R.I., 390 A.2d 920 (1978), Infantolino contends that at his trial the judge instructed the jury incorrectly because the instructions placed the burden of proof on the issue of self-defense upon him. The applicant argues that our ruling in Doe must be given retroactive effect and claims, therefore, that the denial of his postconviction relief application should be reversed. The record on this appeal consists essentially of the trial transcript transmitted to this court on the applicant's unsuccessful appeal reported in State v. Infantolino, 116 R.I. 303, 355 A.2d 722 (1976). We restate the facts digested in that opinion insofar as they are pertinent to this appeal.

On April 13, 1974, Charles Neves and his friend William Mammone went to a nightclub to celebrate Neves's change of jobs. During the evening they each took a seat at the bar adjacent to Doris Bajakian. Doris's sister Diane, who was Infantolino's girlfriend, was seated at a table to the rear of the three chairs. Shortly after midnight, Infantolino entered and took Doris's seat; she sat on his lap. The applicant engaged in a conversation that involved both sisters and, intermittently, Neves and Mammone.

Just before 2 a. m. Neves apparently said something offensive to applicant because Infantolino hit Neves with a punch that sent him to the floor. A wrestling match ensued, causing the club's bouncers to move in and separate the combatants. The management directed Neves and Mammone to leave the club by the front door, while a bouncer escorted applicant to a side exit. Once Infantolino appeared to regain his

---

1. The applicant was convicted also of carrying a pistol without a license. He does not challenge the legality of that conviction in this proceeding.

composure, he was ordered to leave by the side exit.

Concern about the possibility of the renewal of the fist fight prompted Neves and Mammone to ask Infantolino's girlfriend to accompany them outside. Neves, the first down the front stairs, was waiting on the sidewalk for Mammone and Diane Bajakian to join him when Infantolino came around the corner from the side exit. Mammone testified that he was standing on the front steps when Infantolino asked, "Where is he?" and Mammone pointed to the bottom of the stairs and said, "There he is." According to Mammone, Infantolino strode toward Neves, who immediately assumed a boxer's stance. Infantolino, however, pulled a pistol from his waistband and shot Neves twice. Neves stumbled and ran down the street to the next block, where he turned and continued for fifty feet before collapsing onto the sidewalk. Infantolino and Mammone ran along the street after him. Two police officers quickly arrived on the scene, and one captured Infantolino after a short chase on foot.

Neves died following emergency surgery. The medical examiner who performed an autopsy on the victim testified that the entry point of both bullets indicated that he was turning toward his right when he was shot. No one who testified denied that Infantolino struck the first blow or that he shot and killed Neves. Infantolino pleaded not guilty to the murder charge, however, alleging that the killing occurred as he was attempting to defend himself.

Infantolino's entire trial strategy revolved around the doctrine of self-defense. The applicant testified that immediately after their fight, Neves had threatened to kill him. Infantolino insisted that he drew his pistol only after he allegedly saw Neves standing on the sidewalk pointing a gun at him. He claimed that he had fired the two shots to "protect himself." Diane testified that she also saw the deceased point a "square object" at her boyfriend and that it appeared to be a gun.

Although applicant's trial counsel did not object to the trial justice's jury instructions concerning the issue of self-defense, applicant poses such an objection in this proceeding.[2] The applicant contends that the instructions to the jury which placed the burden upon him to establish by a preponderance of the evidence that he acted in self-defense deprived him of his right to due process, as enunciated in In re John Doe, R.I., 390 A.2d 920 (1978).

Preliminarily, we must determine whether our review of the trial justice's charge regarding self-defense is appropriate when trial counsel did not object to the charge. "Under our established procedure, [applicant's] failure to object to the instruction given or to request a different one precludes, at least in ordinary circumstances, a challenge to the correctness or sufficiency of the charge given." State v. McGehearty, R.I., 394 A.2d 1348, 1351 (1978). We have ruled, however, that review of an alleged deprivation of a basic constitutional right "should be available if the failure to comply with the procedural requirement is not a 'deliberate bypass,' if it does not constitute 'sandbagging' by a defense lawyer, and if the record discloses that the breach complained of will constitute something more than harmless error." (footnote omitted) Id. 394 A.2d at 1352; see State v. Roderick, R.I., 403 A.2d 1090, 1092 (1979).

■ There is no question that applicant claims deprivation of a basic constitutional right. The due-process clause protects criminal defendants by requiring that the prosecution prove beyond a reasonable doubt every fact necessary to constitute the crime charged. Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375 (1970). Until our ruling in In re John Doe, a defendant in this state who sought to justify a killing by a plea of self-defense had to prove that defense by a preponderance of

2. We observe that appellate counsel who appeared before us was not counsel at applicant's trial.

the evidence. *See State v. Ballou*, 20 R.I. 607, 40 A. 861 (1898). In *In re John Doe* we ruled in light of *Mullaney v. Wilbur, supra*, that that burden violated the due-process clause of the Fourteenth Amendment to the United States Constitution because the defense of self-defense necessarily negates an element of the crime of murder, as defined by G.L.1956 (1969 Reenactment) § 11–23–1.[3] We therefore held that once a homicide defendant introduces some evidence of self-defense, the burden of persuasion is on the prosecution to disprove that defense beyond a reasonable doubt. *In re John Doe*, 390 A.2d at 926. It is that basic right protected by the due-process clause which applicant asserts in this proceeding.

The applicant's challenge does not raise an issue of trial strategy. Infantolino's trial antedated both the Supreme Court's ruling in *Mullaney v. Wilbur, supra*, and our ruling in reliance on *Mullaney* of *In re John Doe, supra*. *Compare State v. Duggan*, 414 A.2d 788, (R.I., 1980). The instructions at applicant's trial concerning the burden and quantum of proof of self-defense were in full accord with the law then prevailing. *See State v. Ballou, supra* (overruled by *In re John Doe, supra*). In such a situation, a trial strategist would have to have been exceptionally clairvoyant.

■ Under the assumption that the rule enunciated in *In re John Doe, supra*, applies retroactively, the state argues that even if the trial justice failed to give proper instructions, it is harmless error beyond a reasonable doubt. Our review of the record causes us to disagree; the evidence demanded a charge of self-defense. The trial justice's error is the type that " ' "*substantially* impairs its [criminal trial's] truth-finding function and so raises *serious* questions about the accuracy of [the guilty verdict] * * *." ' " *Hankerson v. North Carolina*, 432 U.S. 233, 243, 97 S.Ct. 2339, 2345, 53 L.Ed.2d 306, 316 (1977). We cannot say beyond a reasonable doubt that an error regarding the burden and quantum of proof of self-defense did not affect the jury's verdict. *See Connolly v. Common-*

*wealth*, —— Mass. ——, ——, 387 N.E.2d 519, 526 (1979); *Palmigiano v. Houle*, 618 F.2d 877, 883 (1st Cir. 1980).

■ For these reasons we conclude that our review of applicant's contentions in this case is appropriate. In so concluding, we are not unaware of the suggestion in *Hankerson v. North Carolina*, 432 U.S. at 244 n. 8, 97 S.Ct. at 2345–46 n. 8, 53 L.Ed.2d at 316 n. 8, that, "The States, if they wish, may be able to insulate [convictions prior to *Mullaney*] by enforcing the normal and valid rule that failure to object to a jury instruction is a waiver of any claim of error." We decline to adopt that approach because it would conflict directly with the application to this case of our ruling on reviewability in *State v. McGehearty, supra*.

■ Turning to consider the merits of the Superior Court justice's decision not to apply our ruling in *In re John Doe, supra*, retroactively, we need look only to the decision of *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977). In *State v. Hankerson*, 288 N.C. 632, 220 S.E.2d 575 (1975), the North Carolina Supreme Court had held that once the defendant introduced some evidence of self-defense, *Mullaney v. Wilbur, supra*, required the prosecution to persuade the jury beyond a reasonable doubt that the killing was not in self-defense. Faced with the issue of retroactivity, that court had declined to give its ruling, which is the equivalent of our ruling in *In re John Doe, supra*, retroactive effect. The United States Supreme Court in *Hankerson v. North Carolina, supra*, reversed, ruling that the North Carolina court erred when it declined to apply the rule in *Mullaney* retroactively. Consistent with the ruling of the United States Supreme Court in *Hankerson*, we must apply our ruling under the Federal Constitution of *In re John Doe* retroactively.

■ We thus apply the standard in *In re John Doe* to the instructions given at Infantolino's trial. In determining the correctness of a jury charge, we consider the

---

3. General Laws 1956 (1969 Reenactment) § 11–23–1, as amended by P.L.1979, ch. 178, § 1.

portion[4] objected to in the context of the entire charge. *State v. Howard*, 114 R.I. 731, 740, 339 A.2d 259, 264 (1975); *State v. Verdone*, 114 R.I. 613, 622, 337 A.2d 804, 810 (1975). Viewing the instructions in this manner, we conclude, and the state does not contend otherwise, that the trial justice instructed the jury incorrectly.

█ For the reasons stated, we conclude that once the applicant satisfied the burden of going forward with sufficient evidence to raise the issue of whether he killed in self-defense, it became the state's burden to establish that he did not so act beyond a reasonable doubt. *See In re John Doe* and *Hankerson v. North Carolina*, both *supra*.

The applicant's appeal is sustained, the judgment of conviction of second-degree murder is reversed, and the case is remanded to the Superior Court for further proceedings.

BEVILACQUA, C. J., and DORIS, J., did not participate.

4. The portions objected to, which we consider in the context of the entire charge, are as follows:

"Now where a person admits committing an act but claims that he was justified because of self-defense the defendant has the burden of proof with respect to self-defense. When a defendant claims justification for an act which but for the justification would be criminal, he must establish the justification by a preponderance of the evidence.

"I will get back to that a little later.

"If the defendant was not the aggressor and had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against Charles Neves, then the defendant had the right to employ deadly force in order to defend himself. By deadly force is meant force which is likely to cause death or serious bodily harm.

"In order for the defendant to have been justified in the use of deadly force in self-defense, he must not have provoked the assault on him or have been the aggressor. Mere words, without more, do not constitute provocation or aggression. The circumstances under which he acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable belief that the other person was then about to kill him or to do him serious bodily harm. In addition, the defendant must have

actually believed that he was in imminent danger of death or serious bodily harm and that deadly force must be used to repel it. When a defendant claims justification for an act which but for the justification would be criminal he must establish the justification by a preponderance of proof. Generally the right to use deadly force in self-defense is not available to one who is the aggressor or provokes the conflict.

\* \* \* \* \* \*

"A few minutes ago I mentioned the fact that he has a burden that doesn't happen in every criminal case. But he said, 'Yes, I shot the victim, but I should be found not guilty because what I did was justifiable under the law. I saw a weapon in this fellow's hand, and I shot him to save my own life'. Since he admits the act, but tries to justify it, the burden is now upon him to prove his justification by a fair preponderance of the evidence. He doesn't have to prove his side beyond all reasonable doubt, but if you take the evidence and visualize a scale, in your mind's eye, and you put everything in favor of Mr. Infantolino on one side, and everything opposed to it on the other, if you find that the evidence in his favor weighs a little heavier than the evidence for the state, on the matter of self-defense, then you should find in favor of the defendant. And of course, if you do so find, you will come in with a verdict of not guilty on count one of murder."